In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-24-00107-CR

CLAYTON BERNARD FOREMAN, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
Jefferson County, Texas
Trial Cause No. F21-38410

## MEMORANDUM OPINION

Appellant Clayton Bernard Foreman (Foreman) appeals his conviction for capital murder. *See* Tex. Penal Code Ann. § 19.03(a)(2). In five issues, Foreman complains about the trial court's rulings admitting evidence of extraneous offenses, his recorded statement to law enforcement, and hearsay. Since the trial court did not reversibly err in admitting the challenged evidence, we affirm the trial court's judgment.

# BACKGROUND

On January 14, 1995, "Cynthia's" parents discovered her handcuffed, semi-nude body in the bathroom of her townhouse, where Cynthia had been sexually assaulted and murdered.[1] Although the investigation did not initially identify Foreman as a suspect, DNA evidence collected during Cynthia's autopsy later led law enforcement authorities to arrest Foreman in 2021.

The amended indictment alleges that Foreman "did then and there intentionally cause the death of an individual, namely [CYNTHIA], by drowning and asphyxiation, and the defendant was then and there in the course of committing or attempting to commit the offense of aggravated sexual assault and sexual assault of [CYNTHIA.]" The case was tried to the jury, which found Foreman guilty of the offense charged. The trial court consequently sentenced Foreman to life in prison and Foreman filed an appeal. Because Foreman complains only about the admission of certain evidence, we focus our discussion of the facts on the challenged evidence in our summary of the evidence.

---

[1] We refer to the victim, her family members, and the civilian witnesses and excluded suspects by pseudonyms or familial relationships to conceal their identities. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process"). *See Smith v. State*, No. 09-17-00081-CR, 2018 Tex. App. LEXIS 1874, at *2 n.1 (Tex. App.—Beaumont Mar. 14, 2018, no pet.) (mem. op., not designated for publication).

"Abigail's" Testimony

Abigail testified that she and Cynthia were identical twins and that they were "very[,] [v]ery" close. Not only did Abigail and Cynthia go to school together, they lived together for a few years after graduating from college and becoming teachers. After Abigail married, Cynthia lived alone in the townhouse that she and Abigail previously shared.

Abigail testified that although she and Cynthia were friends of Foreman's first wife and were in Foreman's wedding in 1982, she did not know Foreman and neither she nor Cynthia kept in touch with his wife.

"Mason's" Testimony

Mason testified that in January 1995, he and his wife lived in the townhouse next to Cynthia's and explained that the townhouses were on opposite sides of a shared wall. At about 1:30 or 2:00 a.m. on January 14, 1995, Mason woke to hear "two or three thumps[]" from Cynthia's side of the wall, but the noise was "[n]ot real loud, not enough – and it didn't continue – where we would go knock on her door." In his January 14, 1995 written statement to law enforcement, Mason stated that the sounds continued for sixty to ninety seconds, and that he went back to sleep after the noise stopped. Mason did not hear screaming that morning.

<u>"Max's" Testimony</u>

Max testified that in January 1995, he was twelve years old, and he and his father were staying in Mason's spare bedroom. At about 2:00 or 3:00 a.m. on January 14th, Max was awakened by a sound that "sounded like somebody kicking a wall or beating on the wall." He stated that the noise "happened a couple of times and stopped. Happened a couple more and then stopped." Max later heard noises "like somebody ran down the stairs[,]" and then heard the front door and a car. Max recalled hearing a car radio and seeing the car's lights through the window blinds as the car left. The following day, Max learned that Cynthia had been killed.

When Max gave the police his statement, the police asked him whether he knew of anyone who had a pair of handcuffs. In response, Max identified a neighborhood resident who worked as a security guard, and Max described the man.

<u>Carolyn Lewis' Testimony</u>

Carolyn Lewis ("Lewis") testified that she had worked for the Beaumont Police Department's 9-1-1 center since 1992. Although Lewis was the training coordinator by the time of trial, in January 1995 she was a trainer and a dispatcher.

Lewis described how the recordings of calls to the 9-1-1 call center were preserved, confirmed that the recordings played for the jury were authentic, and that she had compared these recordings with the transcripts of the calls to ensure accuracy.

4

In the first call, the jury heard Cynthia's sister, Abigail. Abigail provided the address and stated that she had just spoken with her parents and thought something terrible had happened at her sister's house. The next call was from Cynthia's mother who stated that she found her daughter murdered, handcuffed, tortured, and drowned in the bathtub.

Despite Lewis' role in authenticating the call recordings and transcripts, she testified that she was not working when the calls were taken and was not involved in the investigation.

Carmen Apple's Testimony

Apple testified that in 1995, she was a Beaumont police officer assigned to the day shift patrol. Apple was one of the officers dispatched to the scene of Cynthia's murder. Upon arriving at the scene, Apple observed Cynthia's body lying "on the floor with her head towards the tub and her legs more towards the door opening." Apple described Cynthia as wearing a t-shirt, but nude from the waist down, with a blue and black striped towel draped over her body. Apple noticed that Cynthia's "hands were handcuffed behind her back[,]" and that there appeared to have been a struggle in the bathroom and the bedroom. She recalled that there was approximately four or five inches of water in the tub.

Although Cynthia's body was lying on the floor when Apple first saw it, Cynthia's father acknowledged that when he found Cynthia's body, it was lying over

5

the edge of the tub. Cynthia's father moved her to the floor and covered her with the towel.

Sara Moon's Testimony

Moon testified that in 1995, she worked as a civilian ID technician with the Beaumont Police Department. Moon described the responsibilities of the ID department technician to include taking fingerprints, photographs, videos of crime scenes and traffic accidents, as well as processing prisoners. Moon and another ID technician gathered their equipment and went to the location, where officers had already secured the scene. Moon took the exterior and interior photographs of the crime scene, following her usual procedure of documenting the scene from the outside and working inward. This approach to documenting the scene allowed Moon to document forced entry, but none was observed in this case. In addition to taking photographs, Moon processed items for fingerprints. Although she obtained a partial print off a wine glass, Moon was unable at the time to compare that print to a suspect.

Dr. Charles Harvey's Testimony

Harvey outlined his educational and professional qualifications as a forensic pathologist and testified that he performed Cynthia's autopsy on the day her body was discovered. Boyd Lamb, of the Beaumont Police Department, was present at the autopsy to accept the evidence Harvey collected. In describing his autopsy procedure, Harvey explained that he would

6

[S]tart with an external examination. You describe the things that are on the body and then the exterior appearance of the skin surface of the body. Following that, you make an incision and open up the body cavities and examine the organs and describe them in terms of weight and anything that's out of normal expectations.

During that process you can take small sections of various organ tissues . . . for microscopic examination. And I did that in this case. . . . I do the sexual assault examination. Took swabs from the vaginal vault, from the anal vault, and from the oral cavity.[2] Those swabs were also smeared out on glass slides for examination. And tubes of blood were collected from the autopsy victim here and submitted along with the sexual assault material that was turned over to Boyd Lamb and the police department.

Specifically describing Cynthia's autopsy, Harvey recalled that when he first examined her body, Cynthia was wearing a sleep shirt and was partly covered with a blue and black striped towel. The shirt and towel were damp but not soaking wet. Cynthia's hands were handcuffed behind her back. Harvey described the multiple blunt and sharp force injuries he observed, explaining that blunt force consists of abrasions and bruises, and that scrapes are considered sharp force trauma. Harvey further explained that the age of a bruise can be estimated by its color, since "[f]resh bruises are purple[]" and "[o]ld bruises are greenish yellow to brown[.]" Of the thirty-six different injuries Harvey documented in his autopsy report, he believed only two of them predated "the trauma that occurred at the time of [Cynthia's] death." According to Harvey, at the time of Cynthia's death, Cynthia sustained

---

[2] In Harvey's opinion, if semen were found in these areas, it was possible that a sexual assault had occurred.

injuries to her head and face; torso, shoulders and hips; and her right leg and foot. Cynthia also had hand and wrist injuries from the handcuffs. Harvey observed foam on Cynthia's nose and mouth and initially determined that she died by drowning in the bathtub at the scene.

While preparing for trial, however, Harvey changed his opinion regarding the cause of Cynthia's death to "restrained asphyxia[.]" Harvey described this biological process as follows:

> Their chest is compressed, and they – they just simply can't breathe. And the characteristics of that are that pressure on the chest puts pressure on the large vein in the upper chest that returns blood to the heart. And that produces a backup of blood because the arterial circulation is still beating from the heart, and it produces this upper body congestion – congestion is a pathological forensic pathology term meaning the blood is engorged in the venous part of the circulation and returned.

> Now, the heart still continues to produce blood pressure by beating because it has blood that returns from the lower part of the body and enables it to circulate blood pressure to the arteries. The arteries are too muscular and stiff to be compressed by that external pressure in the chest.

> So what you end up with is an upper body, dark purplish coloration that is also accompanied by little breaks in some of the small tiny veins and capillaries. And they spread out little hemorrhages that are present and are called Tardieu spots.

> . . .

> Along with that, the blood flows back up in the brain, and the brain starts to swell. And that happened in this case, and it compressed the lower part of her brain against the lower part of her skull, and that is

what stopped her from finally trying to breathe. It's called herniation. And that was the result of the asphyxial type of death.

Harvey testified that a similar finding could have been caused by the application of pressure from behind for about five to ten minutes. He noted that the edge of the bathtub was "a broad enough surface that it might not cause any visible bruising." The manner of death was homicide. Harvey acknowledged that although the presence of semen would not necessarily be evidence of assault, he stated that "[t]he fact that [Cynthia] was handcuffed and dead pretty much rules out consensual."

Boyd Lamb's Testimony

Lamb is a retired Beaumont police officer. Lamb testified that in 1995 he was employed by the Beaumont police department and he was one of the ID technicians involved in photographing and collecting evidence regarding Cynthia's murder. In that capacity, Lamb and Moon "began to process the scene for fingerprints and collect evidence." The evidence collected included the tee shirt Cynthia was wearing, the towel that was placed over her body, a comforter or bedspread, pillowcases, and the handcuffs taken from Cynthia's body. Lamb confirmed Moon's testimony that there was no sign of forced entry to Cynthia's townhouse. Lamb also attended Cynthia's autopsy and collected evidence obtained during that procedure, including the photographs Harvey referred to during his testimony.

George "Mitch" Woods' Testimony

Woods testified that although he was retired by the time of trial, he worked as the chief criminal investigator for the district attorney's office in 1995 when the crime took place. According to Woods, "[t]he use of DNA in law enforcement at that time was a fairly new tool[,]" Woods and his colleagues focused on DNA evidence that might solve this crime. To that end, they took Cynthia's sexual assault kit and other evidence to the FBI crime laboratory and CellMark's laboratory for DNA analysis.

Law enforcement considered Dylan a "potential suspect[,]" interviewed him, and obtained samples of his DNA, but Dylan was excluded as a contributor of the DNA found at the crime scene. DNA samples from "several" other people were also submitted to CellMark for DNA comparison during the course of the investigation.

Cary Oien's Testimony

Oien is a member of the FBI's Quantico, Virginia, laboratory. Oien testified that the laboratory received specimens for testing and comparison to the DNA found on Cynthia. The lab received specimens of DNA taken from Cynthia, Dylan, and two other possible suspects. The laboratory's hair and fiber analysis excluded Dylan and the other two suspects as contributors to the DNA evidence found on Cynthia's body.

David Mittelman's Testimony

Mittelman testified that he works for Othram, a forensic laboratory that provides "advanced DNA testing in support of law enforcement investigations[.]" Mittelman described Othram's role as "a very narrow and focused kind of area of DNA testing[]" that takes place after conventional STR testing fails to generate leads in a case. Instead of using "traditional methods," Othram develops a profile to help law enforcement identify a suspect's family. After reviewing the case file and the evidence obtained, Othram may extract additional DNA from the evidence and develop a profile containing "hundreds of thousands of datapoints" that can be used to generate new leads in the investigation. In this case, Othram developed a profile using Cynthia's vaginal swabs and a piece of fabric cut from the comforter collected at the crime scene. From that profile, Othram created a genotype kit report, which "can then be used to do anything from comparisons to other profiles to genetic genealogy to analysis of biogeographical ancestry[.]" Mittelman then explained the content of that report, which was admitted into evidence without objection.

Melissa Staples' Testimony

Staples, a molecular biologist, testified to her education and training. She recalled that in January 1995, she was working at CellMark, analyzing DNA for criminal cases. As part of her duties, Staples tested DNA evidence from this case and excluded a total of eleven individuals as contributors.

11

Angela Fitzwater's Testimony

Fitzwater testified that in 1995 and 1996, she worked as a forensic analyst at the Jefferson County Regional Crime Laboratory. In this capacity, Fitzwater "would perform serological testing on evidence submitted to the lab for the presence of biological fluids on evidence that was collected from crime scenes." More specifically, she "would perform presumptive and confirmatory testing on the biological fluids to further identify what kind of fluids they were."

Fitzwater examined the comforter collected from the crime scene for the presence of seminal fluid. To do so, she would "visually search the comforter for the presence of a stain that might be seminal fluid." Upon finding such a stain, Fitzwater would swab the stain and add a chemical to the swab. If the swab changed its color to purple, it was a presumptive test for seminal fluid. Further testing confirmed that the stain on the comforter was seminal fluid, so Fitzwater cut out the stained area and stored it for future potential analysis or safekeeping. She also cut out an unstained area of the comforter as a negative control. The comforter cutting was then sent to CellMark for analysis. Fitzwater did not remember sending other items to CellMark but recalled that the "purple and black" towel yielded a presumptive positive test for seminal fluid. Although Fitzwater detected a possible blood stain on a sheet taken as evidence, the amount was insufficient for further testing. Fitzwater

acknowledged, however, that scientific improvements since 1995 might permit further testing.

<u>Cassie Carradine's Testimony</u>

Carradine outlined her educational and professional experience, which included working at the crime lab at the City of Austin and with the Texas DPS. At both locations, Carradine worked in forensic DNA, serology, and biology, and the like. While at the DPS laboratory, Carradine analyzed evidence from this case for comparison to reference samples. This evidence included sperm and epithelial evidence from Cynthia's vaginal swabs, Cynthia's blood sample, a cutting from the comforter, a baseball cap, a toothbrush, and a swab obtained from a pair of pliers.

After developing DNA profiles, Carradine compared these profiles to the DNA profiles from a particular convicted felon and from an unknown suspect in a different case. Both suspects were excluded as contributors of the DNA profile developed from the evidence in Cynthia's case, and Dylan was also excluded. Carradine's analysis of the DNA profiles from the sperm and epithelial cell fractions developed from the comforter stain included a combination of DNA from Cynthia and an unknown male contributor. The analyses of Cynthia's vaginal swab, anal swab, and fingernail scrapings yielded the same result. The analysis of the pliers, however, excluded both Cynthia and the unknown male.

<u>Tom Gill's Testimony</u>

Gill, a retired FBI agent from Ohio, testified that the FBI was contacted in April of 2021 before he retired to assist with a cold-case homicide of Cynthia. The Texas authorities had identified Foreman as a potential suspect, believed that Foreman lived in Gill's area, and sought help covertly obtaining a sample of Foreman's DNA to compare it to a DNA sample from the crime scene. To that end, Gill verified Foreman's address and asked Detective Gammell to do a "trash pull" at Foreman's residence. Gill described a trash pull as "a common law enforcement technique where you surreptitiously collect trash that's put out at the curb and then go through it for evidence." After Gammell performed the trash pull, Gill and Special Agent Hartsough photographed the bags and "went through each item of trash hoping to find something that we thought would contain DNA." The trash search yielded hair, plastic utensils, dental floss, mail addressed to Foreman, and prescription bottles bearing Foreman's name. Gill forwarded these items to the local Texas FBI office.

<u>Tina Lewallen's Testimony</u>

Tina, a Beaumont police detective, testified that she was assigned to the auto theft task force at the time of trial.[3] In about June 2020, Tina learned that Aaron, her

---

[3] For ease of reference, we refer to Detective Tina Lewallen and her husband Detective Aaron Lewallen by their first names unless it is otherwise clear from the context.

husband and a Beaumont police officer, and the Texas Rangers were looking into Cynthia's case. Since Tina had an interest in genealogy and built her own family tree on ancestry.com, she also became involved in the investigation to identify Cynthia's killer.

The suspect's DNA was uploaded to a website called GEDmatch and Tina asked others to send her their DNA files so that those files could also be uploaded to GEDmatch. Centimorgans measures "the proximity of matching DNA." The number of centimorgans one has in common with another person measures the proximity of the family relationship. These family relationships enable a researcher to follow a family tree. Researchers also use public records, such as birth and death certificates, and census records.

During her research, Tina noticed that Shera LaPoint was building family trees with Tina's suspect, so Tina contacted LaPoint and they began to work together. As Tina continued putting the family trees together, she learned that when distant cousins marry, the DNA is passed down and the number of centimorgans increases. Tina testified that this phenomenon is common in Cajun culture because the "area was so isolated for so many generations[.]" To build the family tree, Tina began with the most common recent ancestor and built outward or triangulated. She had a list of names and estimated that it took her about three months to develop leads that had ties to the Beaumont area, and Tina ruled them out through their DNA. Tina

15

finally narrowed her search to Foreman and his brother who both had ties to the Beaumont area. She identified the brothers through "numerous second cousins." Tina and Aaron mapped Foreman's mother's family tree, constructed a family tree on some other matches, and concluded that the suspect had to be a child of Foreman's mother and father.

The next step in the investigation was to surreptitiously obtain Foreman's DNA, so Aaron contacted the Ohio FBI office for assistance. As Gill testified, they obtained items from Foreman's trash for DNA testing.

Shera LaPoint's Testimony

LaPoint, a forensic genetic genealogist, testified that she currently works for DNA Labs International, but in 2020 when she first became involved in this case, she was self-employed. She first developed an interest in genealogy after her grandfather died, and she began her research into her own family history in 2003. At that time, she was just using public records and internet sites. LaPoint took a DNA test on ancestry.com and encouraged all her family members to have a DNA test, including her son, husband, and father-in-law.

LaPoint is a member of the American Association of Professional Genealogists, of the National Genealogical Society, and several local societies. She has assisted people in various types of cases with genealogical research. One of the cases she worked on was a case called the Texas Killing Fields case, and her father-

in-law's DNA was linked to a body that was found in the Calder Road area. As a Professional Genealogist she uses various web sites or databases like DNA Painter, Shared Centimorgan Project and GEDmatch, along with public records, birth and death records.

According to GEDmatch, LaPoint's father-in-law, husband, and son shared DNA links with the unknown DNA the police extracted from swabs taken off Cynthia's body and from other evidence collected at the scene of Cynthia's murder. So, "when law enforcement was looking at that information in the GEDmatch, my E-mail address kept popping up." Since LaPoint's father-in-law was the "highest match [in the family tree] that [she] knew," Lapoint started there and looked for "connections to other DNA matches" and where they may fit in the family tree. When LaPoint gave the lead to Tina, the tree contained approximately 7,409 people, and LaPoint eventually narrowed this number down to two people and she gave those two names to the police in April of 2021.

Brandon Bess' Testimony

Bess, a retired Texas Ranger, testified and described his law enforcement experience, including cold-case investigations. Bess recalled that in January 2020, Detective Aaron Lewallen requested his help with Cynthia's case. The two of them then reviewed the case to develop leads and learned, through Othram, about genetic genealogy as an investigative tool. They included Tina and Lapoint in the

17

investigation. When they learned that Foreman and his brother were suspects, they investigated Foreman by obtaining his DNA for comparison to the DNA taken during Cynthia's autopsy. After they compared the DNA results which matched, Bess was convinced that Foreman was Cynthia's killer, so he and Aaron went to Ohio to interview Foreman.

Not wanting to frighten Foreman, Bess and Aaron asked Foreman to meet them at the local police station for a reason unrelated to Cynthia's murder. Foreman did so, and Bess interviewed him. Bess testified as he did during the Motion to Suppress, confirming that Foreman was there voluntarily and was free to leave. Foreman denied dating or having sex with Cynthia or Abigail, being in Cynthia's home, and claimed he did not know that Cynthia had been murdered.

When Bess told Foreman that Foreman's semen was found on Cynthia's bed and inside her vagina and rectum, Foreman's response was, in Bess' words, "calm, cool and collected and [Foreman] said, 'I don't know how that could've happened.'"

Tanya Dean's Testimony

Dean testified that she was a DNA section supervisor at the Texas DPS Regional Crime Lab in Houston. Dean described her education and experience and noted that one of her professional responsibilities is to receive biological samples for DNA comparison. At the end of the DNA analysis, Dean would "get a picture representation of the genetic profile from those items of evidence[.]" She can then

18

compare that profile to other samples to determine whether they are the same or similar. When a DNA match is reported, it is done in terms of a likelihood ratio, meaning how likely it is that the suspect is a contributor of the DNA sample. Dean stated that a likelihood ratio of 1,000 and above supported inclusion.

Dean was able to obtain a useable DNA profile from the spoons retrieved from Foreman's trash. If Dean assumed that it was Foreman's DNA on the spoons, the DNA mixture Dean obtained from the cutting of Cynthia's comforter was 96.1 septillion times greater "than the probability of obtaining this profile if the DNA came from two unrelated, unknown individuals."[4] Dean's analysis of Cynthia's vaginal swab determined that "the probability of obtaining this mixture profile if the DNA came from Clayton Foreman and one unrelated, unknown individual is 213 septillion times greater than the probability of obtaining this profile if the DNA came from two unrelated, unknown individuals."

After obtaining Cynthia's DNA profile, Dean was able to update her conclusions to further narrow the likelihood that the DNA found at Cynthia's autopsy and at the crime scene came from anyone other than Foreman. Specifically referencing the vaginal swabs, Dean testified that "[t]he probability of obtaining this mixture profile if the DNA came from [Cynthia] and Clayton Foreman is 461

---

[4] Dean explained that 96.1 septillion is 961 followed by twenty-three zeroes and that the population of Earth is about seven billion.

septillion times greater than the probability of obtaining this profile if the DNA came from [Cynthia] and one unrelated, unknown individual." Referencing the anal swab, Dean testified that the likelihood ratio supported the proposition that Foreman was a possible contributor, although Foreman was excluded as a contributor to the profile on the box containing the swab. Dean stated that "[t]he probability of obtaining this mixture profile if the DNA came from [Cynthia] and Clayton Foreman is 15,600 times greater than the probability of obtaining this profile if the DNA came from [Cynthia] and one unrelated, unknown individual."

Aaron Lewallen's Testimony

Aaron, a detective with the Beaumont Police Department, testified that in addition to his other duties, he worked as a task force officer with the local FBI office. In 2020, after Bess approached Aaron about any cold cases that might be solved using genetic genealogy, Aaron researched Cynthia's case "to see if there's anything else that we could do to bring justice to those families." Believing that the biological evidence was promising, Aaron and Bess approached Othram, which developed a profile. They entered the profile into GEDmatch, which identified some distant relatives that the officers used to begin their investigation. From there, Tina and LaPoint helped with Aaron's research. When Tina and LaPoint identified a potential target, Aaron and Bess asked people to volunteer a DNA sample and

obtained about thirty or forty samples. Those DNA profiles were entered into GEDmatch and the research continued.

Aaron and Bess focused on Foreman, who no longer lived in Texas, so Aaron contacted the FBI's Cincinnati field office and requested that personnel obtain Foreman's trash to gather evidence. Items from Foreman's trash, including forks, spoons, and dental floss, were sent to the local FBI office, and later were taken to Tanya Dean at the Houston crime lab. They also obtained Foreman's DNA pursuant to a search warrant.

Foreman's Motion to Suppress (Recorded Interview)

Since Foreman was not given *Miranda* warnings before his interview, he sought to exclude the recording of that interview from evidence on the basis that it violated his Fifth Amendment rights. During the hearing on Foreman's Motion to Suppress the recording of Foreman's interview with Bess and Aaron, Bess testified as the recording was played for the trial court. Bess testified that when he and Aaron interviewed Foreman, Foreman was neither in custody nor under arrest. During the interview, Bess expressly confirmed with Foreman that Foreman was present voluntarily and was free to leave at any time. Moreover, Bess switched seats with Foreman to place Foreman in the chair nearest the door to the interview room, thus demonstrating that Foreman was free to leave. Bess further recalled that he and Aaron were not armed during the interview so as not to intimidate Foreman. Bess

acknowledged that after leaving the interview room, Foreman was arrested pursuant to an arrest warrant the officers procured the previous day.

After considering counsel's arguments and twice viewing the recording of Foreman's interview, the court ruled that law enforcement officers did not violate Foreman's rights by foregoing *Miranda* warnings, since Foreman was not in custody until after the interview. The court explained its ruling, stating:

> An officer's obligation to administer *Miranda* warnings attaches, however, according to the Supreme Court, only where there has been such a restriction on a person's freedom as to render him, quotes, "in custody." And in determining whether an individual is in custody, a Court must examine all the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

> The Supreme Court has made it clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned. So, the two aspects that are important when the warnings are required, which were not made in this case because there was certainly interrogation, the question is whether the defendant was in custody, which would have required the warnings to be expressed to him.

> It is the compulsive aspect of custodial interrogation and not the strength or content of the government's suspicions at the time the questioning is conducted which led the *Miranda* court to require the custodial Miranda warnings to be formally made to a suspect.

> The mere fact that an investigation has focused on a suspect does not trigger the need for Miranda warnings in non-custodial settings, and it is well settled by law that a police officer's subjective view that an individual under questioning is a suspect, even if that is not disclosed to the suspect, does not bear upon the question of whether the individual

22

is in custody for purposes of *Miranda*. One cannot expect the person under interrogation to probe the officer's innermost thoughts unless they are communicated or otherwise manifested to the person being questioned. An officer's evolving but unarticulated suspicions also do not affect the objective circumstances of an interrogation or interview and, thus, cannot affect the *Miranda* custody inquiry.

The threat to a citizen's Fifth Amendment rights that *Miranda* was designed to neutralize has little to do with the strength of an interrogating officer's suspicions. An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed by word or deed to the individual being questioned. Those beliefs are relevant only to the extent that they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action. Even a clear statement from an officer that the person under interrogation is a prime suspect is not in itself dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest. An officer's views concerning the nature of an interrogation or beliefs concerning the potential culpability of the individual being questioned may be one, among many, factors that bear upon the assessment whether the individual was in custody but only if the officer's views or beliefs are somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.

The trial court then reviewed the details of Foreman's interview, noting that Foreman was free to leave, the door was not locked, and Foreman agreed to speak with Bess and Aaron. Finding that Foreman was not in custody during the interview, the trial court stated, "custody may be understood to have occurred when the suspect is physically deprived of his freedom of action in any significant way. That did not occur in this case." Therefore, the court reasoned, "the defendant in this case under

23

these circumstances was not in custody and, thus, the *Miranda* warnings are not – were not necessary under this set of facts and this situation."

Foreman's Interview

In 2021, Bess and Aaron travelled to Ohio to interview Foreman. At the beginning of the interview, Foreman is sitting next to the wall away from the door of the interview room, Bess is seated nearest to the door, and Aaron is next to Bess. After obtaining information such as Foreman's full name, address, and date of birth, Bess confirms that Foreman was present voluntarily, then suggests that he and Foreman "trade seats" to place Foreman nearest to the door and has Foreman open the door to show that it was unlocked. Bess then tells Foreman that he and Aaron were investigating a crime, that Foreman was "not under arrest, you're not in trouble, nothin'" did not "have to talk to us at all," and could "leave at any time." Foreman agreed to speak with the officers.

The interview covers Foreman's work history, from bill collector to ride share driver, before moving to the purpose of the interview: Cynthia's murder. Foreman states in the interview that Cynthia and Abigail were friends of his former wife and were bridesmaids at his 1982 wedding, but he denies maintaining contact with either Cynthia or Abigail since then. Foreman further denies entering Cynthia's house and denies dating or having sexual relations with either Cynthia or Abigail. In addition, Foreman denies familiarity with Cynthia's townhouse location or being aware of

Cynthia's murder. Foreman did, however, recall that Cynthia's brother had died about six months before the interview.

When Bess confronted Foreman with the information that Foreman's DNA was found inside Cynthia, Foreman replied, "I don't know how it got there[.]" Bess then invited Foreman to give his side of the event and Foreman states, "I'm not going to say anything[,]" and invokes his right to counsel. Bess then terminated the interview, and Foreman gathered his belongings and left the interview room. Immediately after Foreman left the room, officers are heard arresting him for Cynthia's murder.

Foreman's Motion to Suppress (Extraneous Offense of Sexual Assault)

In 1981, Foreman was arrested for sexual assault of "Patty."[5] Pursuant to a plea bargain, Foreman pleaded guilty to aggravated assault and was placed on deferred adjudication. Foreman moved to exclude evidence of this extraneous offense, but the trial court admitted it based on its finding that the evidence was "relevant, and its probativeness is not substantially outweighed by undue prejudice."

At the hearing on Foreman's Motion to Suppress evidence of his prior offense, the complaining witness, "Patty," testified. Patty recalled that in 1981, when she was nineteen years old, her car became stuck in a ditch one rainy evening, so she walked to a gas station to call her mother. Foreman was sitting in his car at the gas station,

---

[5] We use a pseudonym for the name of the victim.

and he started talking to Patty. When Patty explained to Foreman that her car was stuck, Foreman asked her whether she knew his brother from having attended the same high school. Foreman then told Patty he was a police officer and offered to take her home. Patty accepted Foreman's offer. Instead of taking Patty home, Foreman took her to a field where he threatened Patty with a switchblade, tied her hands behind her back, and forced her to perform oral sex on him before he sexually assaulted her both anally and vaginally. Foreman then took Patty home.

About a week after the assault, Patty told a friend what had happened, and the police became involved. Foreman was charged with sexual assault or aggravated sexual assault. Although Patty acknowledged having agreed to Foreman's plea bargain, she later regretted doing so.

In front of the jury, Patty testified as she did at the Motion to Suppress hearing. Additionally, Patty stated that when she agreed to Foreman's plea, she did not understand it. Patty also testified that someone called her to let her know Foreman "had admitted it and that he was off the force and that he had got a job at Nabisco. And the caller said that Foreman told them he is about to get married, and he's going to marry [Cynthia]." Patty responded, "'[w]ell, what do I do if I see her out?'" and the caller told Patty, "'Just don't go – don't go approach her.'" She stated that she came forward for Cynthia.

<u>"Daphne's" Testimony</u>

Daphne, Foreman's ex-wife, testified that she and Foreman were married from 1982 to 1993, and that Cynthia and Abigail were bridesmaids at their wedding. Daphne and Foreman had one child together, a son born in 1984. This child was friends with Cynthia and Abigail's nephew and attended the school where Cynthia taught.

Before Daphne and Foreman married, Daphne learned that Foreman had been arrested for a sexual assault. Foreman told Daphne "that it was a big misunderstanding and that the charges had been dropped." Being "very gullible[,]" Daphne went ahead with the wedding despite her parents' objections. At one point, Foreman told Daphne that he thought Cynthia and Abigail were "so cute because they were twins and he felt as though he wanted to make sure he protected them[.]" Daphne did not think anything of the comment at the time, because she agreed that Cynthia and Abigail were cute.

Another time, between 1986 and 1988, Daphne found a briefcase in the trunk of Foreman's car. The briefcase contained "a gun, a set of handcuffs, and some horrible pornographic material." Daphne testified that Foreman had no need of either a gun or handcuffs. When Daphne heard that Cynthia had been murdered, she called Foreman and told him Cynthia had been murdered, but he did not react with any emotion.

## "Kelly's" Testimony

Kelly testified that in 2008 and 2009, she worked for Foreman at a collection agency. During that time, Kelly saw two different pairs of handcuffs in Foreman's desk on two occasions. Kelly also recalled a colleague's joke about nuns and Catholic schoolteachers, to which Foreman responded "'[w]hy are they always called [Cynthia]?'" Although Foreman's comment meant nothing to Kelly at the time, she later read an article about Cynthia's case and realized it was about a murder victim with the same name Foreman had used.

## "Tammy's" Testimony

Tammy testified that she and Foreman had lived together for about four years and were engaged at the time of his arrest in 2021. Tammy stated that she had wanted them to get their DNA tested "to do the National Geographic study of Neanderthal times[]" to see how the family traveled, but Foreman was "vehemently opposed to it[,]" saying, "[h]e didn't want people to have his personal information, and that's how people find you." Foreman also told her that bill collectors find people through DNA tests, which Tammy knew to be untrue.

Tammy testified that she once found pictures of young girls on Foreman's tablet. Although the pictures were not pornographic, when Tammy asked Foreman about them, he claimed that the pictures were of friends' children. Foreman then told her he had the pictures "so that he could fantasize about taking their virginity." When

28

Tammy learned that Foreman had been arrested in 1981 for a sexual assault, Foreman told Tammy it was "a mistaken charge, that they had been drinking and she falsely accused him of rape."

The day Bess and Aaron arrested Foreman, they came to Tammy's home, saying that they needed to speak with Foreman about a purse someone had left in Foreman's vehicle while he was a ride share driver. Although Tammy then had no reason to confront Foreman about going to the police station, she recalled that he turned "deathly pale[]" when the officers asked him to go.

## ANALYSIS

Foreman presents five issues, all arguing that the trial court erred by admitting certain evidence that unfairly prejudiced his defense. We review complaints about the admission of evidence, including the denial of a motion to suppress evidence, under an abuse-of-discretion standard. *See Wexler v. State*, 625 S.W.3d 162, 167 (Tex. Crim. App. 2021); *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). A trial court abuses its discretion if it "'acts arbitrarily or unreasonably' or 'without reference to any guiding rules and principles.'" *State v. Lerma*, 639 S.W.3d 63, 68 (Tex. Crim. App. 2021) (citation omitted). We will not reverse a trial court's ruling on the admissibility of evidence unless it falls outside the zone of reasonable disagreement. *See Dabney v. State*, 492 S.W.3d 309, 318 (Tex. Crim. App. 2016).

29

Issues One and Two: Evidence of an Extraneous Offense (Sexual Assault)

In his first two issues, Foreman argues that the trial court erred in overruling his Motion to Suppress and allowing the State to introduce evidence of his 1981 sexual assault of Patty, because it constitutes "propensity evidence," and the prejudicial effect of this evidence outweighed its probative value. Foreman relies on Rules 403 and 404(b) to support his argument. *See* Tex. R. Evid. 403, 404(b). Rule 403 permits the trial court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. Rule 404(b) states, in pertinent part:

> **(b) Crimes, Wrongs, or Other Acts.**
>
> > **(1)** *Prohibited Uses*. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> > **(2)** *Permitted Uses: Notice in Criminal Case*. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. . . .

Tex. R. Evid. 403(b).

The State responds that it offered this evidence to show "identity, motive, and [to] refute the defensive theory of consent." At trial, the State also argued that it offered the evidence of the extraneous sexual assault to show Foreman's modus operandi, since the two offenses were similar.

30

After considering the parties' positions and holding a hearing outside the presence of the jury, the trial court recited the applicable evidentiary standard and made findings of fact and ruled that the State could use Patty's testimony to show identity, intent, motive, and lack of consent. The trial court further found that the prejudicial effect of this evidence did not substantially outweigh its probative value and that there were "no less than twelve (12) factual common denominators between the cases[,]" as follows:

1. Foreman knew both victims as they all graduated from the same high school;

2. The acts are similar;

3. The offense location (Beaumont, Texas);

4. Offense time (night);

5. Victims' similarity in age to Foreman;

6. Victims resembled each other in appearance;

7. Foreman used a weapon;

8. Foreman used or threatened force;

9. Victims' hands restrained behind their backs;

10. Victims were assaulted both anally and vaginally;

11. Foreman convinced each victim to trust him, thus enabling him to commit the offenses;

12. "[E]ach victim was futilely trying to resist."

31

In addition, the trial court noted that the evidence was admissible to show Foreman's modus operandi. The court also gave a limiting instruction, telling the jury not to consider Patty's testimony unless it found beyond a reasonable doubt that Foreman committed the extraneous offense, and in that event, to consider Patty's testimony only to show identity, intent, motive, and/or lack of consent, and for no other purpose. We conclude that the trial court did not abuse its discretion in finding that Patty's testimony was admissible within the scope of Rule 404(b)(2). *See* Tex. R. Evid. 404(b)(2).

As Foreman observes, the trial court could have excluded Patty's testimony if its probative value were "substantially outweighed by a danger of . . . unfair prejudice[.]" *See* Tex. R. Evid. 403. The record indicates that the trial court balanced the probative value of Patty's testimony against its potential for unfair prejudice and found that "its probative value is not substantially outweighed by unfair prejudice, confusion of the issues, misleading the jury, undue delay, nor needless presentment of cumulative evidence." The trial court's ruling "must be measured against the relevant criteria by which a Rule 403 decision is made." *Perkins v. State*, 664 S.W.3d 209, 217 (Tex. Crim. App. 2022) (citing *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999)). We examine:

1. [H]ow compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable;

32

2. [T]he potential of the evidence to impress the jury "in some irrational, but nevertheless indelible way[;]"

3. [T]he time needed to develop the evidence; or

4. [T]he force of the proponent's need for this evidence to prove a fact of consequence.

*Id.* at 217 (citation omitted).

Given the similarities between Patty's and Cynthia's assaults, the State's need for the evidence, the fact the evidence supported the State's theory and made it more probable that Foreman was the one who assaulted Cynthia, criteria one and four above are satisfied. *See id.* The presentation of Patty's testimony took approximately thirty minutes of a trial lasting over a week. In comparison to the trial as a whole, Patty's testimony was brief, and the jury was not long "distracted" from the evidence about Foreman regarding Cynthia's assault.

Although the challenged evidence did have the potential to impress the jury with the inference of character conformity, the trial court addressed any such inference by giving the jury a limiting instruction during the trial and in the jury charge. This instruction unambiguously limited the jury's consideration of the extraneous offense, and the jury is presumed to have followed the instruction. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005). Accordingly, the second factor also favors admissibility. *See Perkins*, 664 S.W.3d at 217.

33

Since the trial court's decision to admit this evidence is within the zone of reasonable disagreement, we cannot say that the trial court abused its discretion. We accordingly overrule Foreman's first two issues.

Issue Three: Evidence of a Firearm

In his third issue, Foreman argues that the trial court erred by allowing Daphne to testify that she saw a firearm in the trunk of Foreman's car while Foreman may have been on probation. At trial and on appeal, the State has posited that it did not offer this evidence as evidence of an extraneous offense but instead offered it to show "preparation or premeditation[,]" since it was the State's theory that Foreman used a weapon during the commission of the charged offense.

Although the court allowed this testimony, it instructed the jury as it did previously, to "consider this evidence only if you deem that it is proven beyond a reasonable doubt. And it can be used only for the purposes of determining whether an element of this indictment that we are here for, whether an element of that charge is in any way proven by the evidence." The trial court further permitted the jury to consider this evidence for purposes of identity, intent, motive, or lack of consent, only.

According to Daphne, Foreman had no need for a gun, and Foreman's possession of a gun in the trunk of his car supports the State's theory of the case that Foreman subdued his victim[s] with a weapon and is therefore relevant. *See* Tex. R.

Evid. 401 (defining relevance); *see also Montgomery v. State*, 810 S.W.2d 372, 375-76 (Tex. Crim. App. 1990) (discussing relevance). Being relevant, this evidence is admissible unless excluded by a constitutional, statutory, or rule provision. *See Montgomery*, 810 S.W.2d at 376; Tex. R. Evid. 402. Foreman has not shown any mandatory exclusionary requirement or that the trial court abused its discretion by admitting the evidence.

To the extent Foreman claims the probative value of the evidence was outweighed by its prejudicial nature, it is not enough that the challenged evidence be prejudicial since all relevant evidence is prejudicial to some degree. *See Montgomery*, 810 S.W.2d at 378. It is only when the prejudice is unfair that the trial court is empowered to exclude it. *Id.*; Tex. R. Evid. 403. On this record, we cannot say the trial court abused its discretion by admitting the challenged evidence.

We overrule Foreman's third issue.

Issue Four: Recording of Foreman's Interview

Foreman next argues that because he was the main suspect in Cynthia's murder, his April 2021 interview with Bess and Aaron constituted a custodial interrogation. Therefore, he contends, the failure to warn him of his Constitutional rights before the interview, coupled with the trial court's decision to allow the recording of his interview into evidence, constitutes reversible error. *See Miranda v.*

*Arizona*, 384 U.S. 436, 444 (1966); *see also* Tex. Code Crim. Proc. Ann. art. 38.22 § 3.

It is undisputed that in April 2021, Foreman was a suspect in Cynthia's murder, that Bess and Aaron had a warrant for Foreman's arrest at the time they interviewed him, and that they did not read Foreman his *Miranda* warnings before the interview. Absent custody, however, no such warnings were legally required. *See Miranda*, 384 U.S. at 444 (specifically referencing custodial interrogation); *see also Wexler*, 625 S.W.3d at 167 (same); Tex. Code Crim. Proc. Ann. art. 38.22 § 3 (same).

Custody is a mixed question of law and fact that does not turn on witness credibility and demeanor unless the witness testimony (if believed) would always decide the custody question. *Wexler*, 625 S.W.3d at 167 (citing *State v. Saenz*, 411 S.W.3d 488, 494 (Tex. Crim. App. 2013)); *Herrera v. State*, 241 S.W.3d 520, 526-27 (Tex. Crim. App. 2007). We apply a bifurcated standard of review (1) giving almost total deference to the trial court's factual assessment of the circumstances surrounding the questioning, and (2) reviewing the ultimate legal determination of whether the person was in custody under those circumstances under a de novo standard of review. *Wexler*, 625 S.W.3d at 167. The trial court determined that Foreman was not physically deprived of his freedom of action in any significant way; that Foreman was never told he could not leave; that officers did not create a

situation wherein a reasonable person would believe his freedom of movement was significantly restricted; and that Foreman was not restrained from moving. Based on these findings, the trial court further found that Foreman was not in custody during the interview and that *Miranda* warnings therefore were unnecessary.

A custody determination requires two inquiries: the circumstances surrounding the interrogation and whether a reasonable person in those circumstances would have felt that he was not free to terminate the interrogation and leave. *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). "Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test" to determine whether there was restraint on freedom of movement of the degree associated with an arrest. *Id.* The ultimate inquiry is whether, under the circumstances, a reasonable person would have believed that his freedom of movement was restricted to the degree associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, 322 (1994); *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996). "The 'reasonable person' standard presupposes an *innocent* person." *Dowthitt*, 931 S.W.2d at 254 (citing *Florida v. Bostick*, 501 U.S. 429, 438 (1991)); *Wexler*, 625 S.W.3d at 167. The Court of Criminal Appeals has generally outlined four situations that may constitute custody: (1) the suspect is physically deprived of his freedom of action in any significant way, (2) a law enforcement officer tells the suspect that he cannot leave, (3) law enforcement officers create a

situation that would lead a reasonable person to believe his freedom of movement has been significantly restricted, or (4) there is probable cause to arrest, and law enforcement officers do not tell the suspect that he is free to leave. *Wexler*, 625 S.W.3d at 167-68 (citing *Dowthitt*, 931 S.W.2d at 255). The defendant bears the initial burden to establish that his statement was the product of a custodial interrogation. *Id.* at 168 (citations omitted).

Foreman did not meet this burden under any of the four situations referenced above. Foreman was, by his own admission, present voluntarily, and therefore was not "deprived of his freedom in any significant way." *See Allen v. State*, 536 S.W.2d 364, 370 (Tex. Crim. App. 1976). He freely went to the police station and spoke with the officers. The officers told him he could leave, they deliberately opened the door of the interrogation room, they did not restrain Foreman in any manner, and the facts negate the second and fourth definitions of custody. The remaining inquiry is whether the officers created a situation that would lead a reasonable, innocent person to believe his freedom of movement has been significantly restricted. Here, the officers did nothing other than question Foreman in a police station and merely questioning a person in a police station does not constitute custody. *See California v. Beheler*, 463 U.S. 1121, 1125 (1983) ("*Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned

38

person is one whom the police suspect.'") (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

In both *Beheler* and *Mathiason*, the defendant voluntarily went to the police station and was questioned there, and in both cases, the Supreme Court held that *Miranda* warnings were not required because the defendants were not in custody at the time of their interviews. *See Beheler*, 463 U.S. at 1121; *Mathiason*, 429 U.S. at 495. Similarly, in *Gant v. State*, we observed that being questioned at a police station does not necessarily constitute custodial interrogation. *See* 153 S.W.3d 294, 300 (Tex. App.—Beaumont 2004, pet. ref'd.).

Foreman argues that since the officers already had a warrant for his arrest, he actually was not free to leave and therefore he was in custody during his interview. At the time of the interview, the officers likely knew that Foreman would eventually be arrested. However, it is not the officers' knowledge of the situation that controls the outcome of the custody determination. *See Stansbury*, 511 U.S. at 319 ("[A]n officer's subjective and undisclosed view concerning whether the person being interrogated is a suspect is irrelevant to the assessment whether that person is in custody."). Relying on *Stansbury*, in *Permenter v. State*, we affirmed the trial court's decision allowing a jury to view the defendant's unwarned recorded statement, since the defendant was not in custody during his interview despite the officers' probable cause for arrest. *See Permenter v. State*, No. 09-23-00177-CR, 2025 Tex. App.

39

LEXIS 4809, at *36 (Tex. App.—Beaumont July 9, 2025, no pet.) (mem. op., not designated for publication).

Given the factual circumstances surrounding Foreman's interview, we conclude that the trial court did not err by finding that Foreman was not in custody during the interview and that *Miranda* warnings therefore were unnecessary. We overrule Foreman's fourth issue.

Issue Five: Hearsay

In his final issue, Foreman argues that the trial court erred by allowing Tina to testify to hearsay explaining why this case was reopened. The challenged testimony follows:

> [] [The Prosecutor]: How did you come to find out that they were opening that case?
>
> [] [Detective Tina Lewallen]: Ranger Bess is a friend of my husband's, and they've worked cases together in the past. And Bess had worked recent cold cases using genetic genealogy and was able to get a solve. So he - -
>
> [] [Defense Counsel]: Your Honor, I'm going to object as nonresponsive.
>
> THE COURT: Question was: How did you come to find out that they were opening that case?
>
> [Defense Counsel]: Also hearsay.
>
> THE COURT: All right.
>
> [] [The Prosecutor]: Was just going into how she got involved in the case and just what made her get involved in the case.

THE COURT: All right. Overruled. Go ahead.

[Detective Tina Lewallen]: So he - - Ranger Bess asked if Beaumont PD had a case that he felt could be solved using genetic genealogy, and my husband offered this case and thought that this one could be solved."

"Hearsay" means a statement that:

(1) the declarant does not make while testifying at the current trial or hearing; and

(2) a party offers in evidence to prove the truth of the matter asserted in the statement.

Tex. R. Evid. 801(d).

Since the challenged statement was made by Tina, and not by either Bess or Aaron, it satisfies the first prong of the above definition of hearsay. Tex. R. Evid. 801(d)(1). We disagree, however, that the State offered Tina's testimony to prove the truth of the matter asserted, and therefore it does not satisfy the second prong of the hearsay definition. As the State indicated to the trial court, it elicited this information to explain how and why Tina became involved in the investigation. Background information offered to explain the context of Tina's involvement in the investigation is not hearsay. *See Langham v. State*, 305 S.W.3d 568, 577 (Tex. Crim. App. 2010*)* (noting that an out-of-court statement may be admissible if it is not offered for the truth of the matter asserted, but only to provide the investigative context in order to explain police conduct). As noted in *Norton v. State*, "'[i]f the fact in controversy is whether a communication was made and not its truth or falsity,

41

the writing, words or other communications is original evidence and not hearsay.'"

564 S.W.2d 714, 717 (Tex. Crim. App. 1978) (quoting *Burchfield v. State*, 475 S.W.2d 275, 277 (Tex. Crim. App. 1972)).

That said, even assuming without deciding that the challenged testimony was hearsay and did not fall within an exception to the hearsay rule, the testimony also duplicated Aaron's testimony, which was admitted without objection, regarding his work with Bess:

> [The Prosecutor]: So, he [Bess] came to you in 2020. Was he looking for that specific case, or was he just looking for a cold case to see if there was something he could help out with?
>
> [Aaron]: For a cold case. He had recently come off an investigation that was in Seabrook, where they did very similar investigative techniques that we use and had some success but their suspect had already passed away.
>
> [The Prosecutor]: So, the techniques that he was using at that time, what was it that he was looking to use?
>
> [Aaron]: Genetic genealogy.
>
> [The Prosecutor]: Had you been familiar with genetic genealogy before that was brought up?
>
> [Aaron]: I was. I had followed the Golden State Killer case, it had been in the news and I kind of watched it and had a cursory understanding of it.
>
> [The Prosecutor]: Did you think it might be helpful in this case?
>
> [Aaron]: When he first approached me, he asked if we had any cases that he felt -- or that I felt like this would work in. I said absolutely. This is the first one that came to mind.

Foreman did not object to this testimony. When the same or similar evidence is offered without objection, error is not preserved. *See Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991); Tex. R. App. P. 33.1(a). Therefore, this objection was not preserved.

We overrule Foreman's final issue.

## CONCLUSION

Having overruled all of Foreman's issues, we affirm the trial court's judgment.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on November 5, 2025
Opinion Delivered January 7, 2026
Do Not Publish

Before Johnson, Wright and Chambers, JJ.